CENTRAL STATES TIRE RECYCLING OF NEBRASKA, LLC,
APPELLANT, V. STATE OF NEBRASKA, DEPARTMENT OF
ENVIRONMENTAL QUALITY, AND MICHAEL J. LINDER,
DIRECTOR, APPELLEES.
687 N.W.2d 681

Filed October 15, 2004.    No. S-03-556.

John D. Feller, of Feller & Houston, for appellant.

Jon Bruning, Attorney General, Jodi M. Fenner, and Katherine J. Spohn, Senior Certified Law Student, for appellees.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.
## NATURE OF CASE
An order issued by Nebraska's Department of Environmental Quality (DEQ) revoked the "Scrap Tire Hauler, Collector, and Processor Permit" that DEQ had previously issued to Central States Tire Recycling of Nebraska, LLC (Central States). Central

States filed an appeal pursuant to the Administrative Procedure Act in the Dodge County District Court. The district court affirmed the order of DEQ.

## SCOPE OF REVIEW

■ A judgment or final order rendered by a district court in a judicial review pursuant to the Administrative Procedure Act may be reversed, vacated, or modified by an appellate court for errors appearing on the record. *Lariat Club v. Nebraska Liquor Control Comm.*, 267 Neb. 179, 673 N.W.2d 29 (2004).

■ When reviewing an order of a district court under the Administrative Procedure Act for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.*

■ The interpretation of statutes and regulations presents questions of law, in connection with which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below. See *A & D Tech. Supply Co. v. Nebraska Dept. of Revenue*, 259 Neb. 24, 607 N.W.2d 857 (2000).

## FACTS

At all times relevant to this case, Central States was in the business of hauling, collecting, and processing "scrap tires." Central States mainly concerned itself with collecting scrap tires within the vicinity of Wisner, Nebraska, and producing a product known as Enviro-block. Central States describes this product in the following manner:

> The Enviro-block tire bale is a compacted, rectangular cube made from cut and arranged parts of 100 scrap car tires, or an equivalent in scrap truck tires. . . . The Enviro-block is intended to be used as a long lasting engineered solution for civil and agricultural engineering applications, livestock management, and marine structures.

Brief for appellant at 6.

On July 28, 2000, DEQ issued Central States a 5-year permit to haul, collect, and process scrap tires and to operate a scrap tire collection site in Nebraska. The permit included a number of general conditions. The second of these conditions stated that

"[t]he permittee is prohibited from depositing scrap tires at any location not permitted or licensed to accept scrap tires. [DEQ] on a case-by-case basis may approve alternative sites." The permit required that Central States "comply with Title 136 [the Scrap Tire Management Rules and Regulations] and all other applicable local, state, and federal requirements."

After receiving its permit, Central States began collecting scrap tires for a fee. These tires would then be used to make Enviro-blocks. Central States made between 75 cents and $1 per 20 pounds when collecting scrap tires. It usually sold the Enviro-blocks for $7.50 to $8 per ton, although the sale price was at times as high as $12 to $15 per ton.

In September or October 2000, Central States applied for permission to use Enviro-blocks in a project to improve the company's manufacturing site in Wisner. The project was approved by DEQ, and Central States used Enviro-blocks as a means of stabilizing the soil and elevating the grade for its use as a manufacturing site.

In January 2001, William Miner, the president and major stockholder of Central States, bought two plots of undeveloped property in Wisner. The developer of the property was to be an entity called TransAgra Capital Corporation (TransAgra). Miner was also the president of TransAgra.

In March or April 2001, Central States applied to DEQ for permission to use Enviro-blocks as a lightweight fill on one of the plots that Miner had purchased in January. Miner testified that this project was similar to the project DEQ had approved for Central States' manufacturing site. Specifically, he stated that both properties were low lying, below road level, and not suitable for development without fill. Before Central States received approval for this project from DEQ, TransAgra bought approximately 4,300 Enviro-blocks from Central States, which began placing them on the property as fill.

DEQ commenced an investigation of the property after complaints were filed by neighbors. A program specialist in the compliance department of DEQ was sent to investigate the site on August 31, 2001. David Haldeman, an administrator with DEQ, called Miner that day, informed him that he did not have

permission to deposit scrap tires at the location, and ordered him to immediately cease the activity.

On September 6, 2001, DEQ sent Central States a notice of violation which stated that the August 31 inspection revealed the placement and burial of tire bales. The letter noted that such a project had not been approved by DEQ and offered a plan for voluntary compliance to be completed by September 20. Miner subsequently sent a letter to DEQ denying the allegations contained in the notice of violation.

A second notice of violation was sent to Central States on October 3, 2001. This letter offered a plan for voluntary compliance to be completed by November 1. Haldeman testified that Central States had not taken any of the steps required for compliance.

DEQ then sent Central States a notice of intent to revoke its permit to haul, collect, and process scrap tires. The notice stated that Central States had deposited scrap tire bales at an unpermitted and unlicensed site without obtaining or possessing the approval of DEQ. DEQ found this action to constitute a violation of the conditions of Central States' permit which prohibited it from depositing scrap tires at any location not permitted or licensed to accept scrap tires.

In its answer and request for a hearing, Central States denied that it had deposited scrap tires at any location not permitted, licensed, or approved by DEQ. It alleged that Enviro-blocks are a tire-derived product and not properly classified as scrap tires. Further, it asserted that DEQ lacked the authority to either limit or restrict the placement of Enviro-blocks or revoke Central States' permit. Central States alleged that it had complied with all terms and conditions.

A hearing was held before DEQ, and on October 18, 2002, the hearing officer issued his findings of fact and conclusions of law. The final order issued by the director of DEQ determined that Enviro-blocks were not tire-derived products and that their placement could be regulated by DEQ. In response to Central States' argument that 136 Neb. Admin. Code (1996) was unconstitutionally vague, the director concluded that he lacked the authority to find any state law, agency rule, or regulation unconstitutional.

The director also concluded that any challenges that Central States offered against the permit conditions were collateral attacks of a final and binding order of DEQ. As such, he concluded that Central States could have appealed these conditions or sought a modification or review of the conditions before taking actions in defiance thereof. The director revoked the permit issued to Central States because it had deposited scrap tire bales at an unpermitted and unlicensed site, which violated the terms and conditions of the permit.

Central States petitioned for review of DEQ's final order, and the Dodge County District Court affirmed DEQ's final order. The court found that Enviro-blocks did not cease to be waste tires simply because they were placed in baled form, that DEQ had the authority to impose conditions on the disposal of waste tires, and that Central States was familiar with these regulations. It concluded that Central States' vagueness challenge lacked merit because the terms in 136 Neb. Admin. Code were sufficiently defined and the permit itself provided clarification and definition. Central States timely appealed.

## ASSIGNMENTS OF ERROR

Central States assigns the following restated errors to the order of the district court: (1) the court's finding that Enviro-blocks are waste or scrap, as defined in 136 Neb. Admin. Code, is not supported by competent evidence and is arbitrary, capricious, or unreasonable; (2) the court erred in failing to find that 136 Neb. Admin. Code, ch. 5, § 006, is unconstitutionally vague, in violation of the Due Process Clauses of the state and federal Constitutions; and (3) the court erred in failing to find that DEQ exceeded its express legislative authority in regulating Enviro-blocks.

## ANALYSIS

### CHARACTERIZATION OF ENVIRO-BLOCKS AS WASTE OR SCRAP

Central States first argues that the district court erred in finding that Enviro-blocks are waste or scrap as defined in 136 Neb. Admin. Code. It contends that this finding is not supported by competent evidence and is arbitrary, capricious, or unreasonable.

A judgment or final order rendered by a district court in a judicial review pursuant to the Administrative Procedure Act may be reversed, vacated, or modified by an appellate court for errors appearing on the record. *Lariat Club v. Nebraska Liquor Control Comm.*, 267 Neb. 179, 673 N.W.2d 29 (2004). When reviewing an order of a district court under the Administrative Procedure Act for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.*

This appeal concerns the powers delegated to DEQ under the Integrated Solid Waste Management Act (Waste Management Act), see Neb. Rev. Stat. §§ 13-2001 to 13-2043 (Reissue 1997, Cum. Supp. 2002 & Supp. 2003), and the Waste Reduction and Recycling Incentive Act (Waste Reduction Act), see Neb. Rev. Stat. §§ 81-15,158.01 to 81-15,165 (Reissue 1999, Cum. Supp. 2002 & Supp. 2003). Many of these statutes have been amended or repealed over the years. All statutory references herein will be to those laws in effect in August 2001, which is when Central States allegedly deposited Enviro-blocks on an unpermitted and unlicensed site.

The appeal also involves an interpretation of 136 Neb. Admin. Code, otherwise known as the Scrap Tire Management Rules and Regulations. The interpretation of statutes and regulations presents questions of law, in connection with which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below. See *A & D Tech. Supply Co. v. Nebraska Dept. of Revenue*, 259 Neb. 24, 607 N.W.2d 857 (2000).

Section 81-15,162.01(1) provided in relevant part: "A tire collector, tire processor, or tire hauler shall obtain a permit from [DEQ] unless exempted under subsection (2) of this section." We note that subsection (2) did not contain language which would suggest that Central States is exempt from the permit requirement. In addition, under § 81-15,162.01(5), the Waste Reduction Act granted the Environmental Quality Council the authority to adopt rules and regulations to establish a process by which a tire collector, processor, or hauler may obtain a permit from DEQ. The majority of 136 Neb. Admin. Code outlines this process and the

requirements necessary to maintain a permit. See 136 Neb. Admin. Code, chs. 3 through 11.

The disposal of scrap tires is prohibited by 136 Neb. Admin. Code, ch. 2. Specifically, 136 Neb. Admin. Code, ch. 2, § 002, states that "[o]n and after September 1, 1998, land disposal of scrap tires in any form shall be prohibited." This language reflected a provision of the Waste Management Act. See § 13-2039(3)(b). Also, 136 Neb. Admin. Code, ch. 2, § 003, states that the "[p]ermanent disposal of scrap tires shall be prohibited, unless otherwise approved by the Director [of DEQ], for facilities accepting scrap tires after the initial effective date of this title." Thus, it is clear from such language that disposal of scrap tires is prohibited without a permit from DEQ.

The question for our consideration is whether Central States' product, the Enviro-block, is a tire-derived product or merely a scrap tire that has been shaped into a new physical form. If it is a scrap tire, it is subject to regulation by DEQ. To aid us in our determination of what constitutes a tire-derived product, we examine certain sections of the Nebraska Administrative Code and the Waste Reduction Act.

At all times relevant to this case, the Waste Management Act contained no definition of the terms "waste tire," "scrap tire," or "tire-derived product." The Nebraska Administrative Code defines a "scrap tire" as "a tire that is no longer suitable for its original intended purpose because of wear, damage, or defect." See 136 Neb. Admin. Code, ch. 1, § 019. This is identical to the definition of a "[s]crap tire" in the Waste Reduction Act at § 81-15,159.02(6). The term "[t]ire-derived product" is defined as "the usable materials produced from the chemical or physical processing of a scrap tire." See 136 Neb. Admin. Code, ch. 1, § 024. However, this definition does not include the entire language found in § 81-15,159.02(9), which states that "[t]ire-derived product means the usable product produced from a scrap tire. Tire-derived product does not include . . . baled tires . . . ."

Central States argues that once scrap tires are mechanically formed into a bale and bound with wire, they cease to be scrap tires. It contends that its Enviro-blocks are now a new tire product as defined in 136 Neb. Admin. Code. It asserts that Enviro-blocks are therefore not subject to the permit requirements because

such blocks are no longer "scrap tires." We disagree. The Enviro-blocks are still baled tires, and for purposes of the Waste Reduction Act, baled tires are not included within the definition of a "tire-derived product."

Both the hearing officer and the director correctly concluded that a scrap tire bale is not a tire-derived product within the meaning of the Waste Reduction Act and other applicable provisions of the law. Although Enviro-blocks may be useful in a variety of engineering applications, they remain compressed bales of scrap tires. They are an environmental threat and are subject to regulation by DEQ. Since DEQ can and does require permits for end use of baled scrap tires, this condition placed upon Central States' permit was lawful.

Central States argues that the definition of "tire-derived product" found under the Waste Reduction Act is inapplicable to the case at bar because the definition was used in conjunction with the granting of money from two funds set up by the act. Specifically, the term is used in two provisions of the Waste Reduction Act as an example of the type of development project that the act attempted to encourage through the establishment of the funds. See §§ 81-15,160(4) and 81-15,161.01(2). Central States submits that the Waste Reduction Act does not limit or affect the actual beneficial use of tire bales.

We do not find Central States' argument persuasive. One of the stated purposes of the Waste Reduction Act was to facilitate the recycling and reduction of scrap tires. See § 81-15,159.01(2). The recycling of scrap tires appears to be the main purpose for the manufacturing of a product such as the Enviro-block, and as such, that process is regulated by the Waste Reduction Act. As noted above, the Legislature has clearly indicated that in the realm of scrap tire recycling, baled tires should not be included in the definition of "[t]ire-derived product[s]." See § 81-15,159.02(9). Since the Enviro-block cannot be considered a tire-derived product, it must, by necessary implication, fall under the definition of a "scrap tire." See 136 Neb. Admin. Code, ch. 1, § 019. For these reasons, the district court's finding that "[t]ires do not cease to be waste tires simply by baling them" was supported by the law and was neither arbitrary, capricious, nor unreasonable. Central States' first assignment of error lacks merit.

CONSTITUTIONALITY OF 136 NEB.
ADMIN. CODE, CH. 5, § 006

Central States next challenges the constitutionality of 136 Neb. Admin. Code, ch. 5, § 006, on vagueness grounds. The challenged provision states:

> **General Conditions.** [DEQ] shall impose such conditions in a permit as may be necessary to accomplish the purposes of applicable laws and these regulations, and as may be necessary to ensure compliance with applicable laws, regulations, and standards. The following conditions apply to all permits:
>
> 006.01 A permittee shall fulfill all reporting requirements of the permit;
>
> 006.02 A permittee shall comply with all other applicable local, state, and federal requirements; and
>
> 006.03 A permittee shall allow full access to existing and available records, and shall allow [DEQ] inspectors entry and access, during reasonable hours, to any building, area, or place, for inspection purposes.

*Id.*

When a legislative enactment is challenged on vagueness grounds, the issue is whether the two requirements of procedural due process are met: (1) adequate notice to citizens and (2) adequate standards to prevent arbitrary enforcement. *Dykes v. Scotts Bluff Cty. Ag. Socy.*, 260 Neb. 375, 617 N.W.2d 817 (2000). In other words, due process requires that an enactment supply (1) a person of ordinary intelligence a reasonable opportunity to know what is prohibited and (2) explicit standards for those who apply it. *Id.* When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court. *In re Conservatorship of Hanson,* ante p. 200, 682 N.W.2d 207 (2004).

Central States argues that the permit process outlined in 136 Neb. Admin. Code, ch. 5, § 006, does not set forth specific guidelines or criteria. It claims that the conditions stated in its permit did not provide any more specific guidance. In particular, it points out that under general permit condition No. 2, DEQ was allowed to approve alternative sites for the depositing of scrap tires on a case-by-case basis.

Central States also contends that DEQ is forbidden from using documents entitled "Environmental Guidance Document" and "Special Permit Conditions" in order to clarify permit conditions. It argues that these two documents were created by DEQ but were never approved by the Environmental Quality Council, which therefore makes them invalid.

Section 81-15,162.01(5) granted authority to the Environmental Quality Council to adopt and promulgate rules and regulations to establish a process whereby a tire collector, processor, or hauler may obtain a permit from DEQ. The bulk of 136 Neb. Admin. Code clearly accomplishes this purpose. Specifically, 136 Neb. Admin. Code, ch. 5, § 006, delegates to DEQ the task of imposing conditions upon these permits that are necessary to accomplish the purposes of applicable laws and regulations. There is nothing in state law which requires that such conditions also be approved by the Environmental Quality Council.

We conclude that 136 Neb. Admin. Code, ch. 5, § 006, meets the requirements of procedural due process for constitutional challenges on vagueness grounds. It provides adequate notice to citizens that the conditions of the permit will be established by DEQ. In addition, it contains adequate standards to prevent arbitrary enforcement. Specifically, it provides that the conditions established by DEQ are to be necessary to accomplish the purposes of the laws and regulations applicable to the activities regulated by the permit.

In its order, the district court properly characterized Central States' constitutional argument in the following manner:

> Central States' constitutionally based vagueness challenge to [136 Neb. Admin. Code, ch. 5, § 006] is not well taken. The pertinent terms are sufficiently defined. Plus, the permit, itself, provided additional clarification and definition. Central States can hardly contend that it did not have sufficient notice that it was not to place the baled tires on a site until such use had been approved.

Accordingly, we find Central States' second assignment of error to lack merit.

### DEQ's Authority to Regulate Enviro-blocks

Central States' final assignment of error concerns DEQ's authority under the Waste Reduction Act to regulate Enviro-blocks.

As with its vagueness argument, Central States points to the "Environmental Guidance Document" and "Special Permit Conditions" as evidence of additional permit conditions generated by DEQ but not approved by the Environmental Quality Council. Central States argues that such approval was required under § 81-15,162.01(4).

However, as discussed above, we conclude that DEQ has properly been entrusted with the task of establishing permit conditions to ensure compliance with applicable law and regulations. Contrary to Central States' position, § 81-15,162.01(4) dealt only with those who possessed a tire collection permit. It specifically stated that "[s]uch permit shall contain any conditions determined necessary by [DEQ] to ensure environmental protection . . . ." *Id.* Nowhere in this statute was the approval of the Environmental Quality Council required.

We conclude that DEQ did not overstep its authority in placing conditions upon Central States with respect to the manufacturing, placement, and use of Enviro-blocks. Central States' final assignment of error lacks merit.

## CONCLUSION

The order of the district court conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. We therefore affirm the judgment of the district court.

AFFIRMED.